Page 1

IN THE UNITED STATES DISTRICT CIRCUIT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

MICHAEL WILLIAMS and
MICHELLE WILLIAMS,
    Plaintiffs,

VERSUS        CIVIL ACTION NO.: 1:06-cv-00055-LTS-RHW

STATE FARM FIRE AND CASUALTY COMPANY,
    Defendant.

30(b)(6) DEPOSITION OF STATE FARM FIRE AND CASUALTY

    MARSHA SLAUGHTER, DESIGNEE

Taken at the Offices of Bryan, Nelson,
Schroeder, Castigliola & Banahan,
4105 Hospital Road, Pascagoula, Mississippi,
on Thursday, October 19, 2006, commencing
at approximately 9:00 a.m.

REPORTED BY:

    TINA M. BRELAND, RPR, CSR #1385
        State-Wide Reporters
        4400 Old Canton Road
      Jackson, Mississippi 39211
      Telephone: (601) 366-9676

Page 2

```
 1  APPEARANCES:
 2
     WILLIAM C. WALKER, JR., ESQUIRE
 3   Walker Law Firm
     299 South 9th Street, Suite 100
 4   Oxford, Mississippi 38655
     Telephone: (662) 234-8074
 5   Fax:  (662) 234-6653
 6
         AND
 7
 8   JACK L. DENTON, ESQUIRE
     Denton Law Firm
 9   955 Howard Avenue
     Biloxi, Mississippi 39530
10   Telephone: (228) 374-8722
     Fax: (228) 374-6117
11       ATTORNEYS FOR PLAINTIFFS
12
     H. BENJAMIN MULLEN, ESQUIRE
13   Bryan, Nelson, Schroeder, Castigliola
        & Banahan, PLLC
14   Medical Arts Plaza
     4105 Hospital Road, Suite 102-B
15   Pascagoula, Mississippi 39581
     Telephone: (228) 762-6631
16   Fax:  (228) 769-6392
         ATTORNEY FOR DEFENDANT
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1       TABLE OF CONTENTS
 2
 3
     EXAMINATION BY:              Page
 4
       Mr. Walker                 5
 5
     EXHIBITS:
 6
       Exhibit 1, Notice of Deposition      6
 7
       Exhibit 2, State Farm Policy        10
 8
       Exhibit 3, Letter, dated 9/13/05    14
 9
       Exhibit 4, Claim History Review     34
10
     STIPULATION                  4
11
     COURT REPORTER'S CERTIFICATE        36
12
     WITNESS SIGNATURE SHEET             37
13
```

Page 4

```
 1            STIPULATION
 2       It is hereby stipulated and agreed by and
 3  between the parties hereto, through their respective
 4  attorneys of record, that this deposition may be taken
 5  at the time and place hereinbefore set forth, by Tina
 6  M. Breland, RPR, CSR, Court Reporter and Notary Public,
 7  pursuant to the Federal Rules of Civil Procedure, as
 8  amended;
 9       That the formality of READING AND SIGNING is
10  specifically NOT WAIVED;
11       That all objections, except as to the form of
12  the questions and the responsiveness of the answers,
13  are reserved until such time as this deposition, or any
14  part thereof, may be used or is sought to be used in
15  evidence.
16            ---
```

Page 5

```
 1            MARSHA SLAUGHTER,
 2       having been duly sworn, was examined and
 3       testified as follows:
 4            EXAMINATION
 5  BY MR. WALKER:
 6       Q.  Would you state your name for the record,
 7  please, ma'am.
 8       A.  Marsha Carpenter Slaughter.
 9       Q.  Ms. Slaughter, my name is Bill Walker, and I
10  just met you a minute ago.  Jack Denton and I represent
11  the plaintiffs in this lawsuit, and I'm going to be
12  asking you some questions here today.
13       First of all, as I understand it, you're
14  being offered to speak for the corporation as to
15  certain matters; is that right?
16       A.  Yes.
17  MR. WALKER:
18       And, as I understand it, Ben, from our
19  previous conversations, to the extent that Mr. Blaylock
20  has already testified in Tejedor, Broussard and Gemmill
21  as to some of the so-called institutional acts or what
22  we are claiming are bad faith, we will be able to rely
23  upon what he said and not have to go into that with
24  her; is that correct?
25  MR. MULLEN:
```

Page 6

1    That's correct. She is here according to
2 your notice to take her deposition for area one, which
3 is the handling of this claim. And part of area four,
4 which would be the authority of the adjuster. So she
5 knows about that.
6    The rest of that looks like the institutional
7 stuff. The voluntary disclosures, I think, as memory
8 serves, was the claim file, and we've got a copy of
9 that with her today. So that's part of the incident
10 claim, so obviously feel free to ask her about that.
11 MR. WALKER:
12    I'm going to have this notice, the 30(b)(6)
13 notice marked, please, ma'am, and attached as an
14 exhibit.
15    (Exhibit 1 was marked.)
16 MR. WALKER:
17    Before we launch into anything, I have got --
18 you have previously produced the claim file up through
19 10/24/05, it seems to me to be the last entry. And I
20 noticed that there is something blacked out up above
21 that, which I guess might be a more subsequent entry.
22    What I'm interested in, Ben, is having the
23 claim file through or even after litigation has been
24 filed, and if there is any more of it that has not been
25 produced to me that was developed after litigation has

Page 7

1 been filed, I'm asking for that now.
2 MR. MULLEN:
3    Okay. What is blacked out there at the time
4 I did it was, I guess I was thinking post litigation.
5 I understand there has been some rulings about that
6 since then. I can tell you right now it's an entry
7 essentially stating that -- it's an entry stating that,
8 transmitting the file to counsel, and that was all it
9 is. If I can put my hands on it here, I'll show it to
10 you and I'll be glad to give you a clean copy of that,
11 as soon as I find it.
12    It's an entry dated 1/17/06. It says, Moving
13 claim per your request, which was post litigation. But
14 there is the original page. If you want a copy of
15 that, I'll be glad to make you one.
16 MR. WALKER:
17    That's fine. And as I understand it, then,
18 there wouldn't be any documents after this that would
19 relate to the handling of this claim that would not be
20 protected or asserted to be protected by the
21 attorney/client privilege?
22 MR. MULLEN:
23    That's correct. The additional work on this
24 particular claim has been through this litigation, and
25 I think we had experts go out and I think I provided

Page 8

1 you their reports. That's the only thing that's been
2 done.
3    But as far as the claim file itself or any
4 claims handling, we've been dealing with the issues in
5 the lawsuit. So there is no more to the claim file.
6 MR. WALKER:
7    For some reason I don't have your expert
8 report. It might be in Jack's office. Did y'all do an
9 expert in this case?
10 MR. MULLEN:
11    I'm sorry. This is not one. Okay. Strike
12 that. Forget the expert.
13    That would have been the only other thing. I
14 noticed you looked rather confused, Bill.
15 MR. WALKER:
16    I thought it just never got to my office.
17 And that happens with me and Jack sometimes, it may be
18 at his and not at mine.
19 MR. MULLEN:
20    No, there is nothing else on this claim.
21 MR. WALKER:
22    Thank you very much.
23 MR. MULLEN:
24    Other than what we've been doing.
25 MR. WALKER:

Page 9

1    Q. Ms. Slaughter, if you would, give us briefly
2 the benefit of your education and work background,
3 please, ma'am.
4    A. Graduated from Madison County High School in
5 1986 in Madison, Virginia and attended Mary Baldwin
6 College in Stanton, Virginia and received my degree in
7 1995 in business administration.
8    Started with State Farm in '86 as a mail and
9 file clerk in tidewater underwriting in the Virginia,
10 Charlottesville, Virginia office. Six months after
11 that was promoted to a claims service assistant in the
12 subrogation unit, still in that Charlottesville
13 regional office.
14    After I completed my degree, I became a fire
15 claim representative in the Fairfax, Virginia service
16 center. I worked in the Fairfax, Virginia service
17 center for approximately four years. And in '99, I was
18 selected for catastrophe services fire claim
19 representative. I've been working in that realm ever
20 since, up until June I was promoted to catastrophe
21 services training.
22    Q. And what does catastrophe services mean in
23 general?
24    A. It is a department that was established to
25 react to catastrophes, you know, within the United

Page 10

1 States border.
2    Q. Before Katrina, were there any catastrophes
3 that you had reacted to in your capacity working for
4 the catastrophe section?
5    A. Yes.
6    Q. What were those, just generally?
7    A. Hurricane Andrew, Hurricane Hugo, Bonnie,
8 Charley, Ivan, Jean, Katrina.
9    Q. Thank you, ma'am.
10       Ben, I know that she is not offered to
11 discuss the policy, but I'm going to just make a copy
12 so I won't lose it, it's a certified copy that y'all
13 produced, as the next exhibit, please, ma'am.
14       (Exhibit 2 was marked.)
15 MR. WALKER:
16    Q. We have been provided, in other Katrina
17 litigation, in the Bass vs. State Farm case, Harry
18 Allen's office was able to get us a copy of the
19 September 13th, 2005 wind water claim handling
20 protocol.
21       And I'm going to ask Ms. Slaughter, is this
22 document, this wind water claim handling protocol a
23 document that was utilized in connection with handling
24 of the incident claim?
25    A. I've never seen that.

Page 11

1    Q. Did you receive any communication from
2 anybody at State Farm relating to a wind water protocol
3 and/or a procedure for handling these Katrina claims?
4    A. The direction that we were given basically
5 followed the policy guidelines, so we were told that if
6 a home had a slab left and you could -- the adjuster
7 could go out and determine the proximity of the water,
8 looking at the weather data maps that we had, the FEMA
9 maps that we had, the Haag engineering reports and also
10 looking at the water marks in trees and the debris
11 level and they could determine from their inspection
12 if, you know, the cause was water, then we would deny
13 it based on the policy.
14       If they got out there and the house was still
15 standing and had, say, a two-foot waterline, then again
16 referring back to the policy, we would deny, you know
17 what was below the two-foot waterline based upon the
18 water denial in the policy. And anything above that we
19 could determine was wind we would pay that as wind.
20    Q. Who did you get this direction from?
21    A. The cat coordinator.
22    Q. Who was the cat coordinator?
23    A. John Diggenhart.
24    Q. Did Mr. Diggenhart give you this in written
25 form or was it -- did he give it to you in written

Page 12

1 form?
2    A. No. We had meetings.
3    Q. And when did you have your first meeting in
4 which he told you that?
5    A. I do not remember.
6    Q. Was it at some time before this particular
7 claim was handled, or do you know?
8    A. I would say yes.
9    Q. Tell me, if you will, what you remember about
10 the first meeting you had with this gentleman in which
11 he gave you information, direction, I suppose, on how
12 to handle these claims. Tell me what happened in that
13 meeting, what you remember.
14    A. Basically, we were told to refer to the
15 policy, to encourage our adjusters to go out and
16 investigate the surrounding areas, the property, to
17 document, get good photos, the proximity of the water
18 and to basically offer additional living expenses until
19 we actually got the official documentation from FEMA,
20 the National Weather Center and Haag Engineering.
21    Q. Were you told anything in connection with how
22 far the water was away from them or where any sort of
23 waterline, interior surge line or anything like that
24 was concerned?
25    A. I'm not sure what you're asking.

Page 13

1    Q. Bad question. I'll start again. I didn't
2 ask it worth a flip.
3       Let me go back. You were told to look at
4 various things. And as I understood it, part of this
5 was designed so that an adjuster could be in a position
6 to decide whether or not water caused damage or wind
7 caused damage; is that correct?
8    A. That is correct.
9    Q. I think you said that if there was a slab
10 left that wasn't a waterline up two feet or some number
11 of feet on the structure still standing there, if it
12 was just a slab, then tell me what you did to determine
13 whether water caused the damage.
14    A. We took into consideration the proximity of
15 the property to the water, looked at, you know, trees,
16 if the bark and watermarks were on the trees, if debris
17 was in the trees, the surrounding properties. When we
18 received the National Weather reports and the FEMA
19 flood maps and the Haag Engineering, we used those
20 items to determine whether water caused the damage.
21    Q. Do you know when you received those?
22    A. I do not know the date.
23    Q. Do you know in connection with the handling
24 of this claim, do you know whether or not you received
25 those while this claim was being handled?

Page 14

1  A. Looking at the data, I would say we had that
2  information.
3  Q. When we look back through here, we may be
4  able to come up with something that will help you
5  identify when you think you got it?
6  A. Possibly.
7  MR. WALKER:
8      I'm going to mark this wind water protocol as
9  the next exhibit, please, ma'am.
10     (Exhibit 3 was marked.)
11 MR. WALKER:
12 Q. What's been marked as Exhibit 3 is dated
13 September 13, 2005, and it says, To State Farm Claims
14 Associates -- excuse me, Claim Associates handling
15 CAT PL in the Central and Southern Zones.
16     Do you know what the CAT PL stands for?
17 A. Cat PL.
18 Q. What --
19 A. Cat PL, catastrophe is the cat, and it's just
20 shortened. And each catastrophe has a different code,
21 alphabetical. So Cat PL would be Katrina. And the
22 next catastrophe, whether it might be in California or
23 whatever, it might be PM.
24 Q. So PL is the code letters for Katrina?
25 A. Katrina, yes.

Page 15

1  Q. And tell me what your title was at the time
2  of Katrina.
3  A. A claims manager.
4  Q. Of what?
5  A. I mean team manager, I'm sorry.
6  Q. Catastrophic team manager?
7  A. Catastrophe team manager.
8  Q. How come you didn't get one of these things
9  that was sent to --
10 A. I said I didn't recall getting it.
11 Q. Do you know whether you got it or not?
12 A. Honestly, I can't remember.
13 Q. Well, would you be considered a State Farm
14 claims associate handling Cat PL in the central and
15 southern zones?
16 A. Yes, I would.
17 Q. So if this was sent to the people that it
18 says it was sent to, you should have got one, right?
19 A. Yes.
20 Q. But you just personally can't remember it?
21 A. Yes.
22 Q. You said that you would handle these claims
23 consistent with the policy. And so looking at this
24 particular claim, this would have been handled
25 according to the policy that was in effect for this

Page 16

1  particular rental property; is that correct? And I'm
2  showing you a copy of what I just marked.
3  A. Yes.
4  Q. This was something that was produced to us in
5  discovery, and you have a copy of it there before you.
6      And in this particular case, there would have
7  been coverage for the dwelling and coverage for
8  personal property; is that correct?
9  A. Under a covered loss.
10 Q. Yes, ma'am.
11 A. Yes.
12 Q. And there would have also been coverage for
13 loss of rents, since this was a rental property; is
14 that correct?
15 A. Under a covered loss.
16 Q. Yes, ma'am.
17     So the question, then, is was this a covered
18 loss; is that right?
19 A. Correct.
20 Q. And if we look on Page 5 of the policy, it
21 says, Coverage A - Dwelling and Coverage B - Personal
22 Property, under losses insured, correct?
23 A. Yes.
24 Q. And it says, We insure for accidental direct
25 physical loss to the property described in Coverage A

Page 17

1  and B, except as provided in Section 1, losses not
2  insured. Did I read that correctly?
3  A. Yes.
4  Q. So that means that this policy provides for
5  accidental direct physical loss to the dwelling or to
6  the contents, except things that are listed under
7  losses not insured; is that correct?
8  A. That is correct.
9  Q. So when the hurricane hits, that's accidental
10 direct physical loss, correct?
11 A. The hurricane came with water, which water is
12 considered a loss -- the flood water, surface water,
13 waves, tidal water, overflow of a body of water is
14 considered water damage, which is excluded under the
15 policy.
16 Q. Yes, ma'am. But that doesn't have anything
17 to do with what's said up above, insure for accidental
18 direct physical loss. You start with accidental direct
19 physical loss, correct?
20 A. Right. As long as it's not considered one of
21 the items under losses not insured. The hurricane,
22 that would be considered. So the wind portion of a
23 hurricane, yes, would be considered.
24 Q. Well, all of the hurricane is an accidental
25 direct physical loss, except if it's excluded?

Page 18

1    A.  Right.
2    Q.  So, then, we've got to look down to the
3  exclusions to see what might be excluded, correct?
4    A.  Correct.
5    Q.  And in this case, if you look on Page 6,
6  Paragraph 2, over on the left column, this is the
7  coverage exclusion language that was utilized in this
8  case, correct?
9    A.  Yes.
10   Q.  And, specifically, it goes from that general
11 coverage, that general, 2. Then it gets over to C, the
12 water damage, then it's the water damage parentheses
13 one, flood, surface water, et cetera; is that correct?
14   A.  Yes.
15   Q.  Now, in determining, according to the policy
16 in this particular case, whether excluded water
17 precluded coverage, did you take into account the
18 language that says, We do not insure under any coverage
19 for any loss -- I'm looking under 2 -- which would not
20 have occurred in the absence of one or more of the
21 following excluded events?
22       Did you take that language into account?
23   A.  Yes.
24   Q.  And does that language mean that if water
25 would have taken the whole piece of property, then you

Page 19

1  don't cover anything?
2    A.  Correct.
3    Q.  Even if wind got there first and caused
4  damage first?
5    A.  Correct.
6    Q.  And it says, goes on further to say, We do
7  not insure for such loss regardless of, A, the cause of
8  the excluded event, B, other causes of the loss, C,
9  whether other causes acted concurrently or in any
10 sequence with the excluded loss -- excuse me, the
11 excluded event to produce the loss.
12       Did y'all rely on that language in handling
13 these claims?
14   A.  Yes.
15   Q.  So that would mean that, the way you
16 understood these claims should be handled, if you found
17 that surge would have taken the property, even if wind
18 would have come first and done some damage, it didn't
19 matter, you still didn't owe the claim?
20   A.  If the evidence that was there alluded to the
21 fact that water was the cause or, you know, that's what
22 we had left, we denied the claim.
23   Q.  So even if wind had come first and blown
24 something down, it didn't matter as long as you all
25 were able to determine that in the absence of water,

Page 20

1  the property would have still been standing?
2    A.  If we were able to determine that wind -- if
3  the property had wind damage, we paid for wind damage,
4  if we could determine that based on the evidence that
5  was left.
6    Q.  Well, where does it say that in this policy?
7    A.  Wind is not excluded.
8    Q.  Okay.
9    A.  So, therefore, under accidental direct
10 physical loss, wind is not being excluded.
11   Q.  Well, nothing is excluded under accidental
12 direct physical loss, is it?
13   A.  Well, but it's not one of the losses not
14 insured, then.
15   Q.  And one of the losses not insured is water?
16   A.  Right.
17   Q.  But my question is -- and I thought you said
18 that you relied upon this language. Even if wind would
19 have done some damage, if water would have destroyed it
20 all by itself, you don't pay anything; isn't that
21 correct?
22   A.  Repeat your question.
23   Q.  If water would have destroyed it by itself,
24 whether or not wind occurred, if water would have
25 destroyed the house by itself, you didn't pay it,

Page 21

1  correct?
2    A.  If we could not determine that there was any
3  wind damage, we did not pay it, yes.
4    Q.  Well, that wasn't my question. My question
5  was, if water did it by itself, you wouldn't pay it,
6  correct?
7    A.  Correct.
8    Q.  If water did it and wind also did some of it
9  but you couldn't tell what the wind did, you wouldn't
10 pay it, correct?
11   A.  Correct.
12   Q.  And if wind and water concurrently caused it,
13 you wouldn't pay it, correct?
14   A.  Correct.
15   Q.  And that's what you understood from your
16 meeting with the -- what was his name again?
17   A.  John Diggenhart.
18   Q.  What was his title again?
19   A.  Cat coordinator.
20   Q.  If you will, look with me at portions of the
21 file that you've got in front of you. And I'm looking
22 at Page 60-UW.
23   A.  Okay.
24   Q.  I may not have arranged these in an order
25 that they arise in that file, but I tried to arrange

Page 22

1  them in an order that gave me some sort of
2  chronological history.
3      And at the top of Page 60-UW, it says, Claim
4  History Review; is that correct?
5     A. Yes.
6     Q. And it's a rental dwelling; is that correct?
7     A. Yes.
8     Q. And it's an all perils coverage; is that
9  correct?
10    A. Yes.
11    Q. And it says, Complete structural failure,
12 shed completely destroyed, covered cabana completely
13 destroyed, six person hot tub with wood sides
14 destroyed, contents in shed destroyed, dock destroyed.
15 Is that correct?
16    A. Correct.
17    Q. Is that what occurred at this loss, all these
18 things were destroyed?
19    A. That appears to be the facts that were
20 submitted.
21    Q. Look at 15-EC, if you will, with me, please,
22 ma'am. And that's also got, over on the right side,
23 down toward the bottom, under the word "facts,"
24 complete structural failure, shed completely destroyed,
25 covered cabana. And then it stops. Is that correct?

Page 23

1     A. Correct.
2     Q. Now, in this particular case, since it was a
3  rental policy, there is coverage for lost rental; is
4  that correct?
5     A. Correct.
6     Q. And it's the actual amount of the lost
7  rental; is that correct?
8     A. Correct.
9     Q. And there was coverage on the building for, I
10 don't know whether it's 40,880 or 40,000, looking at
11 those two numbers down there.
12    A. 40,880.
13    Q. And there was coverage for personal property
14 somewhere, but I don't see where it is.
15    A. 2,000.
16    Q. There it is. I see it, yes, ma'am. 2,000,
17 yes, ma'am, Coverage B, thank you.
18       Now, if you will, look at Page 26-EC.
19       Before leaving that other page, I'm just
20 going to make a statement on the coverage question, if
21 this loss were not excluded under the water damage
22 language provisions, then there would be owed on this
23 loss the coverages we just talked about; is that
24 correct?
25    A. Correct.

Page 24

1     Q. Because it's a completely destroyed piece of
2  property, correct?
3     A. Under covered loss, yes.
4     Q. Now back at 26-EC and under "facts," it says,
5  I'll repeat this, Complete structural failure, shed
6  completely destroyed, covered cabana completely
7  destroyed, six person hot tub with wood sides
8  destroyed, contents in shed destroyed, dock destroyed.
9      Where did y'all get those facts, or do you
10 know?
11    A. I do not know. Usually they come from the
12 policyholder when they call in the claim.
13    Q. Then, further down, it says, Probable cause,
14 windstorm; is that correct?
15    A. Correct.
16    Q. Look at 23-EC, please, ma'am. And this is a
17 portion of the activity log; is that correct?
18    A. Correct.
19    Q. And the activity log starts at the bottom of
20 the page and goes up to the top as far as sequence is
21 concerned, correct?
22    A. Correct.
23    Q. And if you look at the bottom entry of
24 9/1/05, would that have been the first contact that you
25 all had in connection with this claim?

Page 25

1     A. Correct.
2     Q. And then on 9/13/05, I'm going up, there is
3  an entry by Roy Sather. Who is that, please, ma'am?
4     A. He was one of the claim representatives.
5     Q. And it says, Talked to ms insured, house is
6  collapsed, house is one story, insured has no flood
7  policy, will have determine flood versus wind on
8  inspection.
9      What is the significance of the insured
10 having no flood policy, if any?
11    A. Because we were trying to match up the flood
12 files with the homeowner files, that they actually had
13 a flood policy. One adjuster was handling both the
14 flood policy, as well as the homeowners policy.
15    Q. And, then, what is the significance of the
16 statement, will have determine flood versus wind on
17 inspection?
18    A. Because we were trying to determine if it's a
19 covered loss.
20    Q. And if it was flood it wouldn't be, if it was
21 wind it would be; is that correct?
22    A. Correct.
23    Q. Then on 10/3/05, there is a note that says,
24 insured is upset because she has tried to get in
25 contact with adjuster and has left several messages for

Page 26

1  him and he called back once.
2      This is a note that's made by Nicole Slinger.
3  Who is that?
4      A. It says that she is from the northeast, she's
5  in the office as a FIRECATQ, so she was in a call
6  center.
7      Q. So a call came in to her someplace where she
8  was. Thank you, ma'am.
9      A. Right.
10     Q. Look back on the top of that page at 10/6/05,
11 this is Mr. Sather again. Was he the one who actually
12 went out and inspected the loss?
13     A. Yes, he was.
14     Q. And it says, Inspected loss with Rachel
15 Williams, daughter of insured, insured lives out of
16 town, house is completely off slab and collapsed, house
17 is in a low lying area and close to a waterway, part of
18 the OB -- what does that mean?
19     A. Outbuilding.
20     Q. Outbuilding was still standing and had some
21 driftwood in the ceiling joists. And then it says,
22 Looks like house was damaged by water. There was
23 debris all the way up to the road, had to walk in to
24 inspect home, will talk to TM Marsha Slaughter to see
25 if we need an engineer.

Page 27

1      Does this reflect the investigation that was
2  done by Mr. Sather? Although, I don't represent that
3  it's all that he says about it. But this would have
4  been notes that he made in connection with that
5  investigation, correct?
6      A. Correct.
7      Q. Did he talk to you concerning whether or not
8  you needed an engineer?
9      A. I do not remember on the specific file.
10     Q. I didn't see an entry that reflected that.
11 Have you looked back through this file, as well; you
12 didn't see an entry either?
13     A. No.
14     Q. If he had contacted you to see if you need an
15 engineer, what would have been your guidelines or
16 procedure in making such a determination?
17     A. The claim representative would come into the
18 office with the claim number. They would have already
19 uploaded their photos, as well as completed their log
20 notes, and we would review the file together.
21     I would look at the FEMA flood maps, as well
22 as the weather data information we had, look at the
23 level of the water in that particular area and review
24 his photos, ask the adjuster any additional questions
25 about the surrounding areas and then come to the

Page 28

1  conclusion whether it qualified to go to an engineer.
2      Q. What would it need to qualify to go to an
3  engineer?
4      A. It would need something that would tell us
5  that we could make the call that it was definitely
6  flood waters.
7      Q. And you felt like under the facts of this
8  case, at least, that you could make the call that it
9  was definitely flood waters; is that correct?
10     A. Correct.
11     Q. When did you get the FEMA maps?
12     A. I'm not sure. I'm thinking sometime in
13 September.
14     Q. When you looked at the FEMA maps, you could
15 see where flood planes were drawn on the FEMA maps?
16     A. Right.
17     Q. Did you also look at something else? I think
18 you said you did.
19     A. The National Weather that told how high the
20 surge got in particular areas.
21     Q. So you could kind of look and see where the
22 surge line would have been --
23     A. Right.
24     Q. -- along the Coast?
25     A. Right.

Page 29

1      Q. And is it accurate to say that if the surge
2  line was high enough to have destroyed the dwelling in
3  this case, then you didn't owe the claim?
4      A. Correct.
5      Q. And you didn't need to ask for an engineer
6  either, did you?
7      A. Correct.
8      Q. But you did no independent investigation to
9  determine whether wind might have gotten there first
10 and done some damage to the property before the surge
11 got there, did you?
12     A. No.
13 MR. MULLEN:
14     Let me object to the form of that question,
15 your word "independent."
16     Go ahead and answer it.
17 MR. WALKER:
18     Q. You said no; is that correct?
19     A. Uh-huh.
20     Q. Did you do any investigation to determine
21 whether wind got there first and did damage, if it was
22 below the surge line, if the surge line was tall
23 enough?
24     A. No.
25     Q. Look at EC-24, if you will, please, ma'am.

Page 30

1  The entry at 10/17 is from Mr. Sather again, says,
2  Finally got letter in, sending in for TM to review
3  letter and to close.
4      What does that refer to, what letter?
5  A. The denial letter.
6  Q. If you will, look at 0002-HO, an October 22,
7  2005 letter.
8  A. Yes.
9  Q. Is that the denial letter you're referring
10 to, or is it something else?
11 A. That's the denial, the revised version of the
12 denial letter.
13 Q. What did the unrevised version say, if you
14 know?
15 A. I do not know. It probably was a typed --
16 could be a typo. Sometimes, because we were dealing
17 with several different policies, the loss is not
18 insured section reads differently. It could have been
19 several reasons that it needed to be corrected.
20 Q. But you don't have a copy of it?
21 A. No.
22 Q. You did not retain a copy of it?
23 A. It was not mailed out, so --
24 Q. On 10/20/05, where we were on 24-EC, that's,
25 Roy, please correct denial letter, from you to Roy,

Page 31

1  correct?
2  A. Correct.
3  Q. And you just don't know what was wrong with
4  the denial letter, but it needed some correction?
5  A. Correct.
6  Q. On 10/19, there are some more statements by
7  Mr. Sather concerning what he looked at and what he saw
8  in his investigation; is that right?
9  A. Correct.
10 Q. And, then, on 10/22/05, still on the same
11 page, you okayed the denial; is that right?
12 A. Yes.
13 Q. And then you okayed to close on 10/22/05,
14 correct?
15 A. Correct.
16 Q. And, then, Ms insured called on 10/24, and
17 she was waiting for the mail or for a call, right?
18 A. Correct.
19 Q. And on 10/24 at 3:04, Mr. Sather makes an
20 entry that he talked to ms insured, advised her she
21 would be getting a letter in a couple of days. She was
22 upset that they were not paying for the damage to her
23 rental property. She said that it is wind damage and
24 not surge damage. She said that she is going to sue
25 State Farm. She had nothing else to say and hung up.

Page 32

1      That's what Mr. Sather noted, correct?
2  A. Correct.
3  Q. And, then, the only other entry we had was
4  one that was in January that involved a transmittal of
5  the file; is that right --
6  A. Correct.
7  Q. -- the one that Mr. Mullen was referring to?
8      If you will, look back at 0002-HO, the
9  October 22, 2005 letter. The second paragraph says,
10 Based upon the results of our discussions, site
11 inspection and investigation, it was determined the
12 damage to your rental property was caused by water.
13     Did I read that correctly?
14 A. Correct.
15 Q. And that is, in fact, what you all had
16 determined?
17 A. Yes.
18 Q. And, then, on the second page of that letter,
19 which is 0001-HO, the paragraph begins, Enclosed please
20 find an estimate for that damage and a draft in payment
21 for that portion of your loss clearly caused by wind in
22 the amount of $0.00, correct?
23 A. Correct.
24 Q. And this would have been part of a form
25 letter you would have used typically if you were -- had

Page 33

1  found something that was clearly caused by wind and
2  were going to send them some money?
3  A. Correct.
4  Q. Usually you don't include that paragraph when
5  you're just denying the entire claim, do you?
6  A. Usually, no.
7  Q. And you have quoted in this letter or -- in
8  fact, you're the one who -- the letter went out over
9  your name, correct?
10 A. Correct.
11 Q. And you have quoted in this letter the loss
12 is not insured language that we looked at earlier in
13 the policy, right?
14 A. Correct.
15 Q. Did you ever, even after suit was filed, did
16 you ever have an engineer go out and determine about
17 the cause of the damage to the property?
18 A. I don't know.
19 Q. You're not aware of anything having been done
20 in that regard since suit was filed, correct?
21 A. No.
22 Q. If you would, I'll hand you Exhibit 3 again,
23 which is the wind water protocol. You said you didn't
24 remember whether you got that or not.
25     Would you take a look at that and see if

Page 34

1  reviewing it jogs your memory on whether you received
2  that or not in connection with the handling of these
3  claims?
4      A.  The contents of the information is very
5  familiar, so I can't say that I didn't get it.
6  MR. WALKER:
7          Let's mark the pages, these are the pages
8  that I referred to in the deposition and may include
9  ones that I didn't refer to. But this is going to be
10 the next exhibit, which will include 60-UW, 15-EC,
11 26-EC, 25-EC, 23-EC, 24-EC, 2-HO and 1-HO.
12         (Exhibit 4 was marked.)
13 MR. WALKER:
14     Q.  In your review of this Exhibit 3, the wind
15 water protocol, did you see anything in there that
16 caused you to think that you didn't handle the claims,
17 this particular claim, consistent with that?
18     A.  No.
19     Q.  You viewed your handling of the claim in this
20 matter consistent with what the wind water protocol
21 said; is that right?
22     A.  Correct.
23 MR. WALKER:
24         I've got no further questions.
25 MR. MULLEN:

Page 35

1          Nothing for me.
2          (Deposition concluded at 9:50 a.m.)

Page 36

1  CERTIFICATE OF COURT REPORTER
2      I, TINA M. BRELAND, Court Reporter and Notary
3  Public, in and for the County of Stone, State of
4  Mississippi, hereby certify that the foregoing pages,
5  and including this page, contain a true and correct
6  transcript of the testimony of the witness, as taken by
7  me at the time and place heretofore stated, and later
8  reduced to typewritten form by computer-aided
9  transcription under my supervision, to the best of my
10 skill and ability.
11     I further certify that I placed the witness under
12 oath to truthfully answer all questions in this matter
13 under the authority vested in me by the State of
14 Mississippi.
15     I further certify that I am not in the employ of,
16 or related to, any counsel or party in this matter, and
17 have no interest, monetary or otherwise, in the final
18 outcome of the proceedings.
19     Witness my signature and seal, this the 23rd day
20 of October, 2006.

23     _____
        Tina M. Breland, RPR, CSR #1385
24      My Commission Expires 4/29/08

Page 37

1          ERRATA SHEET
2  I, _____, do solemnly swear
   that I have read the foregoing _____ pages of the
3  testimony given by me at the time and place
   hereinbefore set forth, with the following corrections:

5  Page:  Line:  Correction:

16         NOTARIZATION
17 I, _____, notary public
18 for the State of Mississippi, _____
19 County, do hereby certify that _____
20 personally appeared before me this _____ day of
21 _____, 2006, at _____, Mississippi.
22 My Commission Expires:
23 _____
          (NOTARY PUBLIC)

10 (Pages 34 to 37)

STATE-WIDE REPORTERS  (800) 372-3376